**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHEM INSURANCE COMPANIES, INC., BLUE CROSS OF CALIFORNIA PARTNERSHIP PLAN, INC., ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, INC., CAREMORE HEALTH PLAN,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>AGRIBANK, FCB,<br><br>　　　　Defendant. | Civil Case No. 22 Civ. 882<br><br>**COMPLAINT** |

Plaintiffs, Anthem Insurance Companies, Inc. ("AIC"), Blue Cross of California Partnership Plan, Inc. ("BCCPP"), Rocky Mountain Hospital And Medical Service, Inc. ("RMHMS"), and Caremore Health Plan ("CHP," which together with AIC, BCCPP, and RMHMS are sometimes referred to collectively herein as "Plaintiffs"), by their counsel, for their complaint against Defendant, Agribank, FCB, alleges as follows:

**I.　　NATURE OF ACTION**

1. This is an action against AgriBank, FCB ("AgriBank", the "Bank", or "Defendant") for the wrongful redemption of certain 9.125% Subordinated Notes due 2019 (CUSIP No. 00850LAA2) (the "Notes"). Plaintiffs were beneficial owners of the Notes, and they were deprived of interest that would been earned but for Defendant's wrongful redemption. Plaintiffs seek damages for lost interest.

## II. PARTIES, JURISDICTION AND VENUE

2. Defendant AgriBank is a farm credit bank and is one of the four banks of the Farm Credit System (the "System" or "FCA"), a federally chartered network of borrower-owned lending institutions comprised of cooperatives and related service organizations. AgriBank is federally chartered under the Farm Credit Act of 1971, as amended (12 U.S.C. §§ 2001-2279cc) (the "Farm Credit Act"), and is subject to examination and safety and soundness regulation by an independent federal agency, the FCA. The principal office of AgriBank is located in the State of Minnesota. Pursuant to 12 USCS § 2258, AgriBank is deemed a citizen of Minnesota.

3. Plaintiff Anthem Insurance Companies, Inc. is a corporation organized under the laws of Indiana with its principal place of business in Indiana. AIC is a citizen of Indiana. As of July 15, 2016, AIC was the beneficial owner of Notes in the face amount of $5,274,000.

4. Plaintiff Blue Cross of California Partnership Plan, Inc. is a corporation organized under the laws of California with its principal place of business in California. BCCPP is a citizen of California. As of July 15, 2016, BCCPP was the beneficial owner of Notes in the face amount of $9,384,000.

5. Plaintiff Rocky Mountain Hospital And Medical Service, Inc. is a corporation organized under the laws of Colorado with its principal place of business in Colorado. RMHMS is a citizen of Colorado. As of July 15, 2016, RMHMS was the beneficial owner of Notes in the face amount of $ 4,685,000.

6. Plaintiff Caremore Health Plan is a corporation organized under the laws of California with its principal place of business in California. CHP is a citizen

of California. As of July 15, 2016, CHP was the beneficial owner of Notes in the face amount of $3,415,000.

7. This Court has personal jurisdiction over Defendant under N. Y. C.P.L.R. § 302(a) because Defendant maintains sufficient minimum contacts in this district, by transacting business, including the marketing and sale of the Notes and the purported redemption thereof, in this judicial district. The Notes provide for payment in New York City, and are governed by the laws of the State of New York. Moreover, an agent of AgriBank is required to maintain a register in New York City for the registration of transfers and exchanges of Notes.

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the action is between citizens of different States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9. Venue is also proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this judicial district, and/or the defendant is subject to the Court's personal jurisdiction in this district.

### III. SUBSTANTIVE ALLEGATIONS

#### A. BACKGROUND OF AGRIBANK AND ITS INDEBTEDNESS

10. AgriBank raises a substantial majority of its funds for its lending and leasing activities and operations through the issuance of debt securities, including bonds, medium-term notes, and discount notes.

11. On July 15, 2009, the Notes were issued in the aggregate principal amount of approximately $500,000,000, pursuant to the terms of that certain Fiscal

Agency Agreement between AgriBank and The Bank of New York Trust Company, N.A., as Fiscal Agent ("Fiscal Agency Agreement", attached hereto as Exhibit A), and the Notes were issued in the form attached thereto.

12. AgriBank offered the Notes with an express limitation on its ability to conduct an early redemption. The limited nature of that redemption right was intended to protect investors, such as Plaintiffs, against prepayment of their Notes – thereby depriving them of interest on the Notes – except in a single, specified circumstance. Plaintiffs were induced to invest by, and acted in reliance on, the limited nature of the redemption right. Under the terms of the Notes, an "Early Redemption" was allowed only upon a "Regulatory Event," defined as follows:

> "Regulatory Event" means receipt by [AgriBank] of a notification from the [Farm Credit Administration], or [AgriBank's] primary regulator at the time, to the effect that, whether as a result of a change in applicable law or regulation or otherwise, (i) no portion of the principal amount of the [Notes] shall any longer be eligible for inclusion in [AgriBank's] Permanent Capital, (ii) the [Notes], together with any other of [AgriBank's] capital instruments held by third parties, shall no longer qualify as total surplus up to a maximum amount of the letter of 100% of core surplus or 40% of permanent capital for purposes of the FCA Regulations or any comparable regulatory capital requirements under any successor regulations, (iii) the [Notes], together with any other of [AgriBank's] subordinated notes or term preferred stock that [AgriBank] includes in permanent capital and total surplus, shall no longer qualify as Permanent Capital and total surplus up to a maximum amount equal to 50% of core surplus for purposes of the FCA Regulations or any comparable regulatory capital requirements under any successor regulations, or (iv) the [Notes] shall no longer qualify for exclusion from total liabilities for purposes of calculating [AgriBank's] net collateral ratio or any comparable regulatory capital requirements under any successor regulations. A Regulatory Event shall not include a 20% per annum reduction in treatment of the [Notes] as permanent capital and total surplus during the five year period immediately prior to maturity.

Ex. A to Ex. 1 attached hereto, ¶ 6(a).

13.　The Notes further provided that following a "Regulatory Event," the Notes could be redeemed on any "Interest Payment Date" – that is, either January 15 or July 15 – at a redemption price of 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest.

14.　On or about May 10, 2016, AgriBank issued notice that, on July 15, 2016, it was going to redeem all of the Notes at 100% of the principal amount, plus accrued and unpaid interest up to, but excluding the redemption date (*i.e.*, through July 15, 2016). See notice attached hereto as Exhibit B ("Early Redemption Notice").

15.　The Early Redemption Notice stated that:

> On March 10, 2016, the Farm Credit Administration (FCA) Board of Directors publically announced the adoption of a final rule modifying certain regulatory capital requirements for Farm Credit System Banks, including AgriBank. The terms of AgriBank's notes provide that, at any time following FCA notification of certain changes to the Bank's regulatory capital requirements, the subordinated notes are redeemable in whole on any interest payment date. The next interest payment date is July 15, 2016.

The Early Redemption Notice did not specify which provision of the Notes' definition of "Regulatory Event" formed the basis for AgriBank's purported action. The Early Redemption Notice also did not disclose the receipt of any specific notice from the FCA that AgriBank purportedly believed caused the occurrence of a Regulatory Event.

16.　As of June 30, 2016, AgriBank declared in its quarterly financial statements that its "robust capital levels ensure we are well positioned to manage the cyclicality that is characteristic of the agricultural market." AgriBank Report for the Quarter Ended June 30, 2016 (attached hereto as Exhibit E), at 1-2. As of June 30,

2016, AgriBank's permanent capital ratio was 21.2%, compared with the 7.0% minimum established by the FCA; its total surplus ratio was 18.0%, more than double the FCA's regulatory minimum of 7.00%; its core surplus ratio was 12.3%, more than three times the FCA's regulatory minimum of 3.5%; and its net collateral ratio was 105.8%, well in excess of the FCA's regulatory minimum of 104%, applicable when an issuer has subordinated debt outstanding. AgriBank report for the quarter ended June 30, 2016 at 26. After its early redemption of the Notes, AgriBank expected its Permanent Capital Ratio, its Total Surplus Ratio, and its Net Collateral Ratio to remain above required levels. See AgriBank report for the quarter ended June 30, 2016, at 9.

17. On July 15, 2016, AgriBank conducted the purported early redemption of the Notes, calling the entire outstanding principal amount of the Notes.

18. AgriBank conducted the purported early redemption, notwithstanding that a "Regulatory Event" (as defined in the Notes) had not occurred, as further detailed below.

### B. FCA's PROPOSED CHANGES TO THE SYSTEM'S CAPITALIZATION REGULATIONS

19. According to the FCA, its regulatory mandate is to "develop regulations (rules) to implement the Farm Credit Act and other relevant laws," "to help the Farm Credit System fulfill its public mission, and to ensure that the System operates safely and soundly." Moreover, "[l]ike all Federal regulations, FCA regulations have the force and effect of law." *See* http://www.fca.gov/law/fca_regs.html.

20. In 2014, the FCA proposed a rule to modify the regulatory capital requirements for System associations and banks, including AgriBank (the "Proposed Rule"). Regulatory Capital Rules: Regulatory Capital, Implementation of Tier 1/Tier 2 Framework, 79 Fed. Reg. 52,814 (Sept. 4, 2014) (available at https://www.federalregister.gov/documents/2014/09/04/2014-19179/regulatory-capital-rules-regulatory-capital-implementation-of-tier-1tier-2-framework).

21. The initial public comment period for the Proposed Rule ended on February 16, 2015. FCA reopened the comment period from June 26, 2015, to July 10, 2015.

22. On or about March 10, 2016, the FCA published a "Fact Sheet on Tier 1/Tier 2 Regulatory Capital Framework Final Rulemaking" (the "Fact Sheet", attached hereto as Exhibit C), which stated in part that the FCA's board adopted a new final rule ("Final Rule") that "will add a new part 628 to FCA's regulations and amend part 615 and other FCA regulations to modify the regulatory capital requirements for Farm Credit System (System) banks and associations (institutions)." The Fact Sheet provided a "Summary of Final Rule," which it described as "replac[ing] existing core surplus and total surplus requirements with common equity tier 1 (CET1), tier 1, and total capital (tier 1 plus tier 2) risk-based capital ratio requirements." The Final Rule "also adds a tier 1 leverage ratio for all [Farm Credit] System institutions, which replaces the existing net collateral ratio for [Farm Credit] System banks." The Fact Sheet stated that "[t]he final rule will become effective on Jan. 1, 2017, and System banks and associations must start reporting

based on the final rule beginning with the quarter ending March 31, 2017." Fact Sheet, at 2.

23. On March 10, 2016, the FCA also issued a news release (the "News Release," attached hereto as Exhibit D) stating that "[t]he Farm Credit Administration Board today adopted the Tier 1/Tier 2 Regulatory Capital Framework final rule, which modifies the regulatory capital requirements for Farm Credit System (System) banks and associations." The News Release stated that:

> [o]ne of the primary objectives of the final capital rule is to modernize the System's capital requirements while ensuring that its banks and associations continue to hold sufficient regulatory capital to fulfill the System's mission as a government-sponsored enterprise.
>
> FCA approved the proposed rule on May 8, 2014. The proposed rule was open for comment for a total of 180 days, during which FCA received more than 2,400 comment letters, including approximately 1,800 comment letters sent by the members of one association. The final rule reflects a, number of changes in response to the comment letters.

The News Release also stated that "[t]he final rule takes effect on Jan. 1, 2017, and System banks and associations must start reporting based on the final rule beginning with the quarter ending March 31, 2017."

24. By statute, "no final regulation of the Farm Credit Administration shall become effective prior to the expiration of thirty calendar days after it is published in the Federal Register during which either or both Houses of the Congress are in session." 12 U.S.C. § 2252(c)(l). While there is an exception to this requirement for emergency situations, 12 U.S.C. § 2252(c)(2), that emergency provision was not invoked or used. Thus, by statute the Final Rule cannot become effective prior to

thirty calendar days, during which either or both Houses of Congress are in session, after it is published in the Federal Register.

25.   On July 28, 2016, the Final Rule was published in the Federal Register. By the terms of the Final Rule itself and as a result of the publication of the Federal Rule in the Federal Register, the Final Rule was not effective until January 1, 2017.

### C.   A "REGULATORY EVENT" HAD NOT OCCURRED

26.   On July 15, 2016, AgriBank forced the Early Redemption of the Notes, notwithstanding that a Regulatory Event had not occurred.

27.   In its financial statements for the first quarter of 2016, AgriBank explicitly recognized that it would not be subject to the Final Rule until 2017. AgriBank stated that "[t]he effective date of the new capital requirements is January 1, 2017. We are currently evaluating the impact of the recently announced changes."

28.   As of July 15, 2016, there had been no change to the regulation constituting a "Regulatory Event."  The News Release and the Fact Sheet stated that the effective date of the Final Rule would be January 1, 2017.  Whether the Final Rule ultimately would have been instituted in conformity with the Fact Sheet's description was impossible to know as of July 15, 2016.

29.   As generally described by the Fact Sheet, the Final Rule did not trigger a Regulatory Event because it did not impose a "comparable regulatory capital requirement."   The Final Rule, which purported to "modernize" the capital requirements applicable to AgriBank, was not comparable to the regulatory requirement contemplated in the definition of a "Regulatory Event."  The prior regime

required AgriBank to meet a certain "net collateral ratio," defined as assets divided by the difference between total liabilities minus subordinated debt. *See* 12 C.F.R. § 615.5301(c)-(d). By contrast, the Final Rule stated that the net collateral ratio was replaced by a tier 1 leverage ratio.[1] Although at a high enough level of generality both the net collateral ratio and the tier 1 leverage ratio may measure the financial health of the regulated institutions, they impose materially different, non-comparable requirements. The Notes are not excluded under the "Tier 1 leverage ratio"; they are simply not measured in the calculation because the Tier 1 leverage ratio is only concerned with Tier 1 capital and does not consider or reference Tier 2 capital (which includes subordinated term debt).

30. Paragraph 6 of the Notes sets forth four specific events which may constitute a "Regulatory Event" permitting early redemption notice. None of those events had occurred when AgriBank wrongfully redeemed the Notes.

31. Subpart (i) of the "Regulatory Event" definition states that a Regulatory Event occurs when "the principal amount of the Notes shall no longer be eligible for inclusion in [AgriBank's] Permanent Capital." The Final Rule did not materially alter the definition of "permanent capital." Even after the adoption of the Final Rule, the Notes were still included in AgriBank's permanent capital.[2] Under the Final

---

[1] Although this term is used in the Fact Sheet, the Fact Sheet is devoid of a precise definition of this term. As ultimately defined in 12 CFR 628.10(c), the "Tier 1 leverage ratio" is defined as "the institution's tier 1 capital to the institution's average total consolidated assets as reported on the institution's Call Report minus amounts deducted from tier 1 capital under §§ 628.22(a) and (c) and 628.23."

[2] The definition of permanent capital is found in 12 CFR § 615.5201, which includes "debt or equity instruments or other accounts the FCA has determined are appropriate to be

Rule, additional minimum capital ratios were added – common equity tier 1 ratio ("CET1"), tier 1 capital ratio, total capital ratio and tier 1 leverage ratio – but the permanent capital ratio was not eliminated. Unlike the permanent capital ratio, the Notes were irrelevant to the new additional ratios, with the possible exception of the total capital ratio. Even assuming that total capital ratio was deemed comparable to the permanent capital ratio, the Notes are still included in the calculation of the total capital ratio, since the numerator of the total capital ratio is tier 1 capital plus tier 2 capital, and tier 2 capital includes qualifying subordinated debt.

32. Under subpart (ii), a "Regulatory Event" occurs when the Notes, together with other capital instruments, no longer qualify as "total surplus" up to a maximum percentage of "core surplus" and "permanent capital"; and under part (iii), when the Notes, together with other subordinated debt and preferred stock, no longer qualify as permanent capital and total surplus up to a maximum percentage of core surplus. The Final Rule did not alter the definitions of "total surplus," "core surplus," or "permanent capital," and it did not exclude the Notes from inclusion in AgriBank's "total surplus," "core surplus," or "permanent capital." Rather, under the Final Rule, "total surplus" and "core surplus" were simply no longer considered in the calculation of the new minimum capital ratios. Even under the new ratios, however, the Notes would not have been treated as liabilities, and they would not have been excluded from the definition of permanent capital. Moreover, the Notes were still included as capital under the total capital ratio, since the numerator of the total capital ratio is

---

considered permanent capital." This portion of the regulation remained unchanged by the Final Rule.

tier 1 capital plus tier 2 capital, and tier 2 capital includes qualifying subordinated debt.

33. Subpart (iv) of the definition of "Regulatory Event" includes any change in which "the Notes shall no longer qualify for exclusion from total liabilities for purposes of calculating [AgriBank's] net collateral ratio or any comparable regulatory capital requirements under any successor regulations." The Final Rule did not materially change the definitions of "total liabilities" or "net collateral ratio." It did not require that the Notes be included in the definition of total liabilities or under any other comparable regulatory capital requirements or under any successor regulations. Moreover, under the Final Rule, the Notes would not have been included in liabilities for purposes of determining the new minimum capital ratios. Subpart (iv) could not have justified AgriBank's early redemption of the Notes.

34. As a result of its untimely and impermissible early redemption, Defendant breached the terms of the Fiscal Agency Agreement and terms of the Notes.

**D. STANDING**

35. Section 6 of the Fiscal Agency Agreement provides:

(b) <u>Remedies Upon Breach of Other Obligations</u>. In the event that [AgriBank] fails to perform any of its other obligations under this Agreement or the [Notes], each Holder of the [Notes] may pursue any available remedy to enforce the performance of any provision of this Agreement or the [Notes]; . . . A delay or omission by any Holder in exercising any right or remedy accruing as a result of [AgriBank's] failure to perform its obligations under this Agreement or the [Notes] and the continuation thereof shall not impair such right or remedy or constitute a waiver of or acquiescence in such non-performance by [AgriBank]

Ex. A, Fiscal Agency Agreement, § 6(b).

36. Cede & Co. ("Cede"), the nominee of The Depository Trust Company ("DTC"), was the holder of record of approximately $500,000,000 principal amount of the Notes as of July 15, 2016, the date of the redemption of the Notes.

37. Prior to filing this Complaint, DTC was informed that Plaintiffs were the beneficial owners of the Notes in the face amount of $22,758,000.

38. At the request of DTC's participant and the custodian of Plaintiffs' interest in the Notes, Cede authorized the Plaintiffs to commence and prosecute litigation, including collecting on its claims raised herein, against AgriBank relating to breaches of its obligations under Notes and Fiscal Agency Agreement, which action(s) Cede, as holder of the Notes, is entitled to take.

39. Cede furnished its authorization as the holder of record of the Notes since it was only a nominal party for the true party in interest, Plaintiffs.

## COUNT ONE
**Breach of Contract**

40. Plaintiffs incorporate by reference each of preceding paragraphs as though fully set forth herein.

41. The Fiscal Agency Agreement and the Notes were at all relevant times valid and enforceable contracts.

42. There was no change in the applicable regulation because the Final Rule, as summarized by the Fact Sheet, was by its own terms not effective until at

least January 1, 2017, or later, and because, as of the date of the purported redemption, the FCA's Final Rule was not published in the Federal Register.

43. By the FCA's own guidelines and by statute, the failure to publish the Final Rule in the Federal Register prevented the Final Rule from having effect when AgriBank's purported redemption occurred.

44. Paragraph 6(a) of the Notes does not require or permit early redemption in advance of the effective date of the "change in applicable law or regulation" triggering a Regulatory Event.

45. The Final Rule did not constitute a "comparable regulatory capital requirement[]" that would trigger the "Regulatory Event Redemption" clause because it is not sufficiently comparable to the current regulatory regime.

46. Prior to redemption, the Notes were tier 2 capital and thus then eligible for inclusion in permanent capital, total assets an/or total surplus for FCA regulations or comparable regulatory capital requirements.

47. The Final Rule did not change the permanent capital ratio; it did not exclude the Notes from inclusion in AgriBank's "total surplus," "core surplus," or "permanent capital"; and the Notes remained excluded from total liabilities for the purposes of calculating the net collateral ratio or any comparable regulatory capital requirements under any successor regulation.

48. As a result of its forced redemption without a Regulatory Event, Defendant breached the Fiscal Agency Agreement and the Notes.

49. As a result of Defendant's breach of the Fiscal Agency Agreement and the Notes, Plaintiffs and the Class have suffered damages in an amount to be determined at trial.

## COUNT TWO
### Breach of the Implied Covenant of Good Faith and Fair Dealing

50. Plaintiffs incorporate by reference each of preceding paragraphs as though fully set forth herein.

51. The Fiscal Agency Agreement and Notes were at all relevant times valid and enforceable contracts.

52. Like all contracts under New York law, the Fiscal Agency Agreement and the Notes incorporate an implied covenant of good faith and fair dealing.

53. AgriBank was incented to redeem the Notes for reasons unrelated to compliance with the Final Rule. If AgriBank had failed to meet or exceed the capital conservation buffer or leverage buffer, its senior executives could have been prohibited from receiving discretionary bonuses without obtaining the prior approval of the FCA. In its 2016 Quarterly Report for the Quarter ended June 30, 2016, AgriBank acknowledged that "[i]f the capital ratios fall below the total requirements, including the buffer amounts, capital distributions (equity redemptions, dividends and patronage) and discretionary senior executive bonuses are restricted or prohibited without prior FCA approval." AgriBank, Report for the Quarter ended June 30, 2016 (attached hereto as Exhibit E), at 27. By maintaining adequate capital buffer amounts and leverage buffers above the applicable risk-based CET1, tier 1, total capital and tier 1 leverage ratio requirements in the proposed regulations,

AgriBank protected and/or enhanced its ability to award bonuses to senior executives without FCA approval.

54. Defendant's course of conduct violated the implied covenant of good faith and fair dealing and public policy because Defendant issued the Early Redemption Notice and consummated the redemption in order to serve its economic and corporate financing interests rather than its regulatory obligations.

55. Defendant prematurely embraced the Fact Sheet as an opportunity to rid itself of indebtedness, as evidenced by the Notes.

56. Defendant's actions deprived Plaintiffs of the benefit of their bargain under the Fiscal Agency Agreement and the Notes.

57. Indeed, Defendant's actions have deprived Plaintiffs of the ultimate benefit of the Fiscal Agency Agreement and Notes: the right to receive interest payments until the stated maturity of the Notes in 2019.

58. No reasonable person would have anticipated Defendant's course of conduct, which was inconsistent with the justified expectations of Plaintiffs.

59. Defendant thereby breached the implied covenant of good faith and fair dealing.

60. Plaintiffs have suffered damages as a result of Defendant's breach of the implied covenant.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays for judgment as follows:

A. Awarding Plaintiffs damages, in an amount to be determined at trial;

B. Awarding Plaintiffs prejudgment interest on any damages;

C. Awarding Plaintiffs reasonable costs and attorneys' fees; and

D. Awarding such other relief in Plaintiffs' favor as the Court may deem just and proper.

Dated: February 1, 2022

                                       REED SMITH LLP

                                       /s/ Samuel Kadosh
                                       Samuel Kadosh
                                       599 Lexington Avenue
                                       New York, NY 10022
                                       Telephone: (212) 521-5400
                                       Fascimile: (212) 521-5450
                                       skadosh@reedsmith.com

                                       Martin J. Bishop*
                                       Lawrence M. Benjamin*
                                       10 South Wacker Drive
                                       Chicago, IL 60606
                                       Telephone: (312) 207-1000
                                       Facsimile: (312) 207-6400
                                       mbishop@reedsmith.com
                                       lbenjamin@reedsmith.com

                                       *Attorneys for Plaintiffs*
                                       *\* PHV forthcoming*